UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

FREDERICK P. KRAHN,            )
                               )
            Plaintiff          )
                               )
        v.                     )   Case No. 2:05 cv 106
                               )
JO ANNE B. BARNHART,           )
COMMISSIONER OF SOCIAL SECURITY )
                               )
            Defendants         )


OPINION and ORDER

This matter is before the court on the Motion for Summary
Judgment filed by the plaintiff, Frederick Krahn, on July 21,
2005. For the reasons set forth below, this motion is **GRANTED**.

Background

The plaintiff, Frederick Krahn, applied for Disability
Insurance Benefits on November 1, 2000, alleging a disability
onset date of February 3, 2000. (Tr. 133)  The claim was denied
initially on January 16, 2001 and upon reconsideration on June
12, 2001. (Tr. 49, 51) Krahn requested a hearing before an
Administrative Law Judge ("ALJ") on July 27, 2001, and a hearing
was held before ALJ Richard VerWiebe on July 26, 2002. (Tr. 74,
480) Subsequent to the hearing, the ALJ denied Krahn's applica-
tion by written decision dated August 26, 2002. (Tr. 57-63)
Citing numerous deficiencies, the Appeals Council remanded the
case to the ALJ on August 8, 2003. (Tr. 68-71) Because ALJ
VerWiebe did not regularly work out of the relevant hearing
office, ALJ William Wilkin conducted a second hearing on May 20,

2004. (Tr. 513-559) Following this hearing at which Krahn and Vocational Expert ("VE") Clifford Brady testified, ALJ Wilkin denied Krahn's application by written decision on August 12, 2004. (Tr. 25-35) Following a denial of his request for review by the Appeals Council on January 28, 2005, Krahn filed a complaint in this court on March 21, 2005. (Tr. 7)

Krahn was born on April 2, 1963 and was 41 at the time of the second hearing. (Tr. 518) He is 5'10" tall and weighs 245 pounds. (Tr. 519) He does not smoke, and he drinks occasionally. (Tr. 536) Krahn lives in a first-floor apartment with his brother and mother in Highland, Indiana, and he has a high school education. (Tr. 519, 520) Krahn most recently was employed as a warehouse worker and truck driver for Southlake Electrical Supply from 1995 to February 2000. (Tr. 145) In this position, he completed minor paperwork and performed deliveries which included unloading equipment weighing up to 200 pounds. (Tr. 145, 520-22)

Prior to 2000, Krahn had some form of preexisting low back problems which included hernias requiring repair in 1985 and 1988, as well as some additional back issues which had required hospitalization for one week in 1993. (Tr. 207, 325-26, 345-46) In January 1998, Krahn reported depression, dizziness, chest pain, and pain in his arms and legs to Dr. Alberto Sanchez. (Tr. 344-47) Dr. Sanchez ordered a sacrum and lumbar x-ray which showed a partial lumbarization of the S1 vertebrae but no other significant abnormalities. (Tr. 338) On February 12, 1998, Krahn told Dr. Sanchez that he was experiencing headaches in the

2

occipital area of his neck, for which Tylenol or Advil provided
mild relief. (Tr. 336) On April 5, 1999, Krahn reported that his
mother had cancer, and Dr. Sanchez diagnosed Krahn with depres-
sion and prescribed Prozac. (Tr. 329) On November 4, 1999, Krahn
told Dr. Sanchez that he was experiencing nervous shakes, dizz-
iness, and lightheadedness, and that he had been having panic
attacks and hyperventilating, for which Dr. Sanchez prescribed
Celexa (Tr. 319) On December 2, 1999, Krahn reported improvement
with the Celexa.(Tr. 317)

On February 1, 2000, Krahn was injured at work, although the
precise circumstances of this injury are unclear.  (Tr. 315)
According to Krahn, he was injured when lifting a 25 lb. box of
steel objects and one object hit him on the jaw. (Tr. 249)
Although he completed the work day, he was sore in his neck and
back the following day, too sore to get out of bed the third day,
and on the fourth day, had developed lightheadedness and diffi-
culty focusing. (Tr. 249) According to the records of Krahn's
treating physician, Dr. Diane Luciani, Krahn sought medical help
two days after the incident, which he described as feeling a
"pull" in his lower back/tailbone area while unloading pallets.
(Tr. 315) On February 7, 2000, Krahn continued to report lower
back pain and shooting pain in his arms and legs. (Tr. 312) Dr.
Luciani prescribed physical therapy. (Tr. 312)

On March 3, 2000, Krahn told Dr. Luciani that his Worker's
Compensation claim had been rejected.  He also reported for the
first time that he had been experiencing neck pain, lightheaded-

3

ness and dizziness since the accident, and he "revealed" that the box of materials had hit him in the jaw one month earlier. (Tr. 308) He continued to report shooting radicular pain down his arms and legs and also described tingling in his feet and hands, with an increase in the hand shaking that he says began in the early 1990s. (Tr. 308)  Dr. Luciani ordered MRIs of Krahn's lumbar and cervical spine which were taken on March 7, 2000 (Tr. 220-24, 307) The cervical MRI showed a "mildly heterogenous signal" without focal lesions or soft tissue abnormalities. (Tr. 223) The lumbar MRI displayed moderate degeneration and mild desicca-tion at the L5-S1 level, but no spinal stenosis or nerve root involvement. (Tr. 221)

On March 10, 2000, orthopedic surgeon Fred Klepsch evaluated Krahn at Dr. Luciani's request. (Tr. 207-08)  Upon examination, Dr. Klepsch found that Krahn had "some generalized tenderness to palpitation in the cervical and lumbar areas" with a generally limited range of motion, but no "gross instability." (Tr. 207) Dr. Klepsch observed a "fine tremor" in both hands and opined that Krahn also may have glove-like hypesthesia in both calves, but he found that Krahn had adequate muscle strength, good coordination, and was able to heel and toe walk. (Tr. 207)  Dr. Klepsch recommended conservative treatment and gave Krahn a prescription for physical therapy, as well as information on stretching. (Tr. 208) Therapy notes from March 16, 2000 indicate that Krahn attended the two prescribed therapy sessions and was shown a home exercise program. (Tr. 209)

4

On March 27, 2000, orthopedic physician Robert Martino evaluated Krahn and noted a "marked paravertebral muscle spasm" and "marked spasm in the cervical spine." (Tr. 234) Dr. Martino further noted that the history of injury described by Krahn was consistent with the type of pain he was reporting. (Tr. 234)

On March 30, 2000, Krahn began two weeks of physical therapy prescribed by Dr. Martino. He reported dizziness, shooting back pain, tingling in his lower legs, numb feet, and low back spasms. (Tr. 402, 407) Upon initial evaluation, he was observed to ambulate with an antalgic gait and use a straight cane.  He also had tenderness with lumbar muscle spasms. (Tr. 402-405)  On his third appointment, therapist Katie Gorski observed "rapid tremors in the area of the tricep down to the hands" in both arms lasting approximately five minutes.  Krahn told her that these tremors occurred for 5-15 minutes about three times a day. (Tr. 399) Krahn still had not improved much after his fourth session, and Dr. Martino sent him to neurosurgeon Marc Levin because Dr. Martino felt that Krahn's MRI did not account for the dizziness, ataxia, and other symptoms Krahn was experiencing. (Tr. 227) Krahn cancelled his last two therapy appointments pending the outcome of his visit to Dr. Levin. (Tr. 398)

On March 31, 2000, Krahn underwent EMG studies of his right arm and left leg. (Tr. 304, 244-47)  These studies were normal with no evidence of radiculopathy in either extremity, but they showed a "decrease in recruitment pattern. . . . related to either pain or fatigue." (Tr. 244)

On April 14, 2000, Dr. Levin examined Krahn and noticed tremoring in his hands with both rest and movement. (Tr. 216) However, the neurological examination was normal, Krahn's gait was normal, and his range of motion was normal.  Dr. Levin could not detect any nerve root or spinal cord impingement on Krahn's previous MRIs but did note the bulging and slightly degenerated disk at L5.  (Tr. 216) He concluded that "at the most [Krahn] has lumbar muscle spasm and cervical muscle spasm, based on the fact there are minimal to no objective findings.  All of his com-plaints are subjective."  (Tr. 216) However, Dr. Levin ordered a brain MRI and recommended a neurology consultation.  (Tr. 216) The MRI, which was taken on April 21, 2000, was normal. (Tr. 219) As recommended by Dr. Levin, Dr. Martino sent Krahn to neurolo-gist Richard Christea. (Tr. 226)

On June 6, 2000, Dr. Christea examined Krahn and reviewed the results of his EMG studies. (Tr. 239-47) Upon examination, Dr. Christea noted that Krahn used a cane and had an "exaggerated physiologic tremor" that was worse with posture, that he could not tandem walk and had an unsteady gait, and that his cervical and lumbar spines were tender bilaterally. (Tr. 242) In a report completed the following day, Dr. Christea stated that "neurologi-cally, his diagnoses are consistent with (1) a post-traumatic vestibulopathy; (2) bilateral greater occipital neuralgia second-ary to (3) a cervical myofascial pain syndrome; (4) a clinical lumbar radiculopathy; and (5) an adjustment disorder."  (Tr. 239) Dr. Christea referred Krahn to the Balance Centers of America for

6

evaluation of his myofascial symptoms and lumbar radiculopathy
and to Dr.King for pain management.  He also prescribed Celebrex
for pain and Paxil for the adjustment disorder.  Finally, he
concluded that Krahn's tremors were "consistent with an exagger-
ated physiologic tremor due to pain and a sense of 'weakness'"
that Dr. Christea anticipated would improve as Krahn's balance
problems improved. (Tr. 239)

Through June and July 2000, Krahn continued to describe
worsening back pain, weakness, dizziness, and tingling or burning
in his hands to Dr. Luciani. (Tr. 292-96) Dr. Luciani also
observed small tremors in both hands.  (Tr. 296) During his
appointments with Dr. Luciani, Krahn stated that he could not
pursue treatment at the Balance Centers and pain clinic due to a
lack of insurance. (Tr. 292, 296)

On August 15, 2000, Krahn received orthopedic and physical
therapy evaluations from the Balance Centers. (Tr. 251, 369-70)
Therapist Noel Del Rosario performed an orthopedic evaluation in
which she found that Krahn's cervical range of motion was some-
what reduced and that all range of motion exercises "produced
pulling-type pain sensation." She also reported that Krahn had
tightness in "both upper trapezius, levator scapulae, scalenii,
hamstrings, piriformis, and Achilles tendons," as well as "ten-
derness of bilateral superior nuchal lines, upper trapezius, para
C3 down to T1, para L2 down to S1, and both sacroiliac joints."
(Tr. 251) She found Krahn's lumbar motions to be "severely
restricted due to increased headaches/dizziness, back pain and

7

muscular tightness" and concluded that Krahn had "cervical and
lumbar limitation of motion secondary to muscular tightness
(cervical) and a disc derangement (lumbar)." (Tr. 251)

Therapist Madonna Grabos performed the physical therapy
evaluation. Her objective findings were that Krahn had "optokine-
tic movements in all planes of motion" and that he "[displayed]
frequent loss of the target in all planes of motion." (Tr. 369)
In addition, Krahn had a "decrease in the end range of medial
gaze" in his left eye when focusing on converging images. In
examination with infrared oculography, Krahn tested positive for
Vestibulo-Ocular Reflex (VOR) stabilization deficit and presented
with nystagmus (involuntary eye movement) "when executing pur-
suits in the vertical planes greater than the horizontal planes."
(Tr. 369) She observed him to ambulate slowly and guardedly with
a cane and show increased antaxia and reliance on his cane "when
executing museum gait activities." (Tr. 370) Subjectively, she
noted that Krahn complained of blurred vision when the image he
was focusing on was about six inches from the converged position.
Krahn also reported an increase in dizziness and disequilibrium
when turning, flexing, or extending his head while simultaneously
focusing on an image. (Tr. 369) Finally, he complained of in-
creased dizziness and lightheadedness in positions that rotated
his cervical spine, and Grabos stated that it was "very difficult
to obtain cervical extension due to the fact that client was very
guarded and resistive to extending the cervical region and
complained of increased discomfort." (Tr. 369)  She concluded

8

that "Krahn displays deficits with his vestibular system func-
tion, a [VOR] stabilization deficit, and compromises in his
static and dynamic balance and ambulation capabilities." (Tr.
370)  While both Grabos and Del Rosario recommended therapy, the
Balance Centers later reported that funding restrictions pre-
vented Krahn from receiving the therapy. (Tr. 251, 367)

        In November 2000, Krahn requested an increase in his Cele-
brex prescription because his current 200 mg. dosage was not
helping.  Dr. Luciani prescribed Vicodin and refilled Krahn's
Paxil and Celebrex prescriptions. (Tr. 287-90)

        On November 11, 2000, Krahn completed an Activities of Daily
Living Questionnaire in which he described his day as waking up
at 6:00 am, watching television all day, taking a nap in the
afternoon, and going to bed at 11:00 pm. (Tr. 157) He said that
he cooked basic meals for himself and drove up to 40 minutes
round trip, but that he did not like to drive because he could
not see very well and because moving his head from side to side
made his vision worse. (Tr. 157-58)

        On December 5, 2000, a representative from the benefits
office contacted Krahn.  During this conversation, Krahn ex-
pressed that he was under "a lot of financial stress" and had not
gone to Dr. Luciani since July 2000 or pursued other treatments
because he lacked the funds to do so. He said that he was mildly
depressed but that the Paxil was helping, and he denied problems
with his memory.  He also stated that he never had received
psychiatric treatment, services, or counseling. (Tr. 170-71)

9

After a follow-up appointment with Dr. Luciani on December 14, 2000 in which Krahn complained of the same symptomology, Dr. Luciani reported that "[a] full neurologic examination was repeated and revealed no deficits."  She concluded, "There were no objective findings to account for his symptoms. He should have no limitations based on objective findings, but pain syndromes are subjective in nature."  (Tr. 285-86)  Dr. Luciani continued to refill Krahn's prescriptions for Paxil, Meclizine, Celebrex, and Vicodin, but she did not see him again until March 2001. (Tr. 279-84, 365)

On December 19, 2000, Dr. Suresh Mahawar evaluated Krahn for the Disability Determination Bureau ("DDB"). (Tr. 252-54)  This examination was normal except for Krahn's gait.  Dr. Mahawar stated that Krahn was "[m]ildly antalgic and able to bear [weight] and walk short distances (up to 100-200') without a cane and needs cane for prolonged walking." (Tr. 254) Krahn displayed moderate difficulty getting on and off the exam table, and he did not want to try any other walking, squatting, or hopping exer-cises. Dr. Mahawar's impression at the close of the exam was that Krahn had dizziness with headaches and uncontrolled hypertension, chronic low back pain, and numbness in his legs and arm, which may be due to neuropathy. (Tr. 254)

On January 3, 2001, Dr. R. Fife completed a Residual Func-tional Capacity ("RFC") Assessment for the DDB. (Tr. 256-63) Based on Krahn's file, Dr. Fife opined that Krahn could lift and/or carry 20 pounds occasionally and 10 pounds frequently,

stand and/or walk about six hours and sit about six hours in an eight hour day, and that he had unlimited ability to push and pull. (Tr. 257) Dr. Fife further stated that Krahn should avoid heights, could never climb a ladder rope or scaffolds, and should avoid concentrated exposure to extreme temperatures, wetness, or vibrations, but he occasionally could climb a ramp or stairs, balance, stoop, kneel, crouch, or crawl. (Tr. 258) He found Krahn's allegations partly credible. (Tr. 261)

On January 5, 2001, Dr. K. Neville completed a Psychiatric Review Technique ("PRT") for the DDB in which he opined that Krahn had a nonsevere anxiety disorder with depressed mood that mildly restricted his activities of daily living and caused mild difficulties in social functioning and maintaining concentration, persistence, or pace. (Tr. 264, 267)

On March 23, 2001, Krahn returned to Dr. Luciani with complaints of severe headaches for the preceeding two weeks. (Tr. 365) On May 9, 2001, he returned to Dr. Luciani for a check-up and refills on his medications. Krahn reported that he would seek help from specialists if he had a final judgment in his favor in his worker's compensation appeal.  Dr. Luciani diagnosed him with low back pain and radiculopathy which was "out of proportion to original injury," and depression. (Tr. 419) On May 31, 2001, Dr. Luciani sent Krahn to the emergency room for evaluation of chest pain he had been experiencing, but no records from this hospital visit are available. (Tr. 363) On August 2, 2001, Krahn returned to Dr. Luciani with complaints of testicular pain.  She referred

11

him to Lapriscopic Surgeon David Bleza for this pain and also increased his Paxil prescription to 30 mg. for his anxiety and depression. (Tr. 361)

Dr. Bleza saw Krahn on August, 31, 2001.  (Tr. 396) After reviewing the results of tests not in the record, Dr. Bleza provided Krahn with the alternatives of continued observation of this pain, or exploratory surgery. Krahn agreed to observation, and no further information regarding this condition appears in the record. (Tr. 396)

On September 14, 2001, Dr. Luciani noted that Krahn had hypertension that was controlled with Altace. (Tr. 360)

On November 16, 2001, Krahn went to the emergency room at The Community Hospital in Munster, Indiana after he felt his back "pop" while sitting down. (Tr. 352) The attending nurse stated that Krahn classified the pain as a "10" and that he could not roll to either side by himself, sit up, or move his extremities due to the pain. (Tr. 352) He was diagnosed with acute myofascial lumbar strain and ordered to rest and perform activity as toler-ated. (Tr. 350) Upon examination three days later, Dr. Luciani noted spasms in Krahn's upper thoracic spine and suggested physical therapy, but Krahn declined therapy due to lack of funds. (Tr. 359) Dr. Luciani once again continued to refill Krahn's prescriptions until August 22, 2002, when Dr. Luciani's office required him to visit for further refills.  Krahn left the office after learning that he would be required to pay due to his lack of insurance. (Tr. 411-18)

12

After Krahn was in a car accident in November 2002, Dr. Elizabeth Przeniczny ordered x-rays of Krahn's right forearm and spine, as well as a CT Scan of his brain. (Tr. 391-95) All of these tests had normal results except the thoracic x-ray which showed mild dextroscoliosis. (Tr. 394) A lumbar MRI ordered by Dr. Przeniczny on December 30, 2002 showed degenerative disc disease with a mildly bulging disc at L5-S1 with osteophytes, causing a bilateral foraminal compromise but no herniation. (Tr. 373) A cervical MRI also showed mild bulging at C5-C6 and C6-C7 mildly impinging on the thecal sac, but no foraminal compromise and no other abnormalities. (Tr. 374)

Krahn attended all 19 physical therapy sessions prescribed following his accident. (Tr. 420) Beyond Krahn's ongoing complaints of pain, therapist Marika Murray noted "significant spasming" and indicated that Krahn would follow up with Dr. Przeniczny regarding his spasms and tremors at the end of December. She then observed a decrease in spasming by the end of January 2003 (Tr. 423, 425) However, by the end of therapy on February 13, 2003, Murray concluded that Krahn had "made little to no progress with physical therapy, possibly due to underlying pathology" and discharged him with a home exercise program. (Tr. 421)

In either subsequent or concurrent therapy sessions prescribed by Dr. Linda Stewart which continued through April 4, 2003, Krahn continued to display chronic pain behavior and "severe para-sympathetic responds [sic] to myofascial release.

13

Symptoms observed are profound sweating, turning pale." (Tr. 436)
Krahn also failed to meet his goals during these therapy ses-
sions.  He continued to have hypertonicity of the paraspinals and
an antalgic gait and posture, and he again was discharged with a
home exercise program. (Tr. 433)

Meanwhile, Dr. Stewart referred Krahn to Dr. Rajive Adlaka
at the Centers for Pain Management for evaluation on January 22,
2003. (Tr. 388-90) During the physical exam, Dr. Adlaka noted
"diffuse bilateral paracervical" muscular spasms as well as
"bilateral paravertebral myofascial spasm" in Krahn's lower spine
and a positive Patrick test on the right leg.  However, the exam
otherwise was normal. (Tr. 389) Dr. Adlaka opined that Krahn had
a "diffuse pain syndrome most likely secondary to myofascial and
discogenic or facet sources" and recommended addressing the
lumbar spine first through epidural injections. He also suggested
a referral to a pain psychologist, given the "diffuse nature of
his pain and the fact that he feels he is completely disabled at
this point in time." (Tr. 390)  An epidural at L4-L5 on January
31, 2003 produced no benefit. (Tr. 385) A prognostic medial
branch block on February 18, 2003 also did not provide relief.
(Tr. 382) After this failed block, Dr. Adlaka suggested referral
to another specialist for evaluation of Krahn's right hip given
his positive Patrick's test. (Tr. 382)

On February 11, 2003, Dr. John Kubinski, also of the Centers
for Pain Management, performed a psychological evaluation of
Krahn. (Tr. 442-44) During this evaluation, Dr. Kubinski did not

14

observe Krahn to be in discomfort despite Krahn's "persistent
verbal descriptions of pain." (Tr. 442) Dr. Kubinski opined that
Krahn's mood was "significantly depressed though the patient
minimizes it." (Tr. 442) He further observed that Krahn's sleep
did not appear as disrupted as Krahn believed, and that despite
Krahn's mother appearing more functional than Krahn himself now
that her cancer was in remission, Krahn still described the
"significant strain being a caregiver for so long." (Tr. 442-43)
Dr. Kubinski commented that Krahn's accident in 2000 did not
appear to be severe at the time and that Krahn was clearly bitter
about the denial of his Worker's Compensation claim.  (Tr. 443)
Dr. Kubinski concluded that Krahn had a "significant level of
depression which I believe is more serious than whatever kind of
pain control is necessary" and that "[t]here seems to be a
significant component of psychosocial factors aggravating his
pain condition." (Tr. 443) Based on Krahn's response to the 2000
work incident, belief that he was disabled, response to his
mother's sickness, and his view that he was significantly injured
by the 2002 car accident, Dr. Kubinski concluded that Krahn had a
passive personality which contributed to his poor response to his
injuries. (Tr. 443-44)

Dr. Adlaka's notes from February 13, 2003 state that "Dr.
Kubinski had significant concerns about the ability to treat this
patient. He feels that a significant component of his problem is
psychological, and he is recommending that his depression be
treated with an antidepressant." (Tr. 385) Dr. Adlaka deferred to

15

Dr. Stewart with regard to this form of treatment. (Tr. 385) Finally, in a February 25, 2003 evaluation, Dr. Kubinski concluded that Krahn had a

> significant layer of psychosomatic component to his physical symptoms or at least this is most likely the case.  The failure of any medical interventions to make any difference, as well as his quite dramatic reaction to a single tablet of Effexor does raise questions about how psychologically reactive he is to treatment.
>
> (Tr. 441)

Krahn also represented to Dr. Kubinski during this evaluation that he never had been instructed to perform home exercises. (Tr. 441)

On January 16, 2004, Dr. Stewart ordered a triple phase bone scan of Krahn's tailbone in response to complaints about pain in that region. This scan had normal results. (Tr. 445)

On April 7, 2004, Dr. Nitin Khanna ordered a discogram of the L5-S1 joint, but the results of this test are not in the record. (Tr. 446) In an April 26, 2004 letter, Dr. Khanna indicated that the discogram had not been performed yet but stated that Krahn "most likely has a discogenic back pain emanating from the L5-S1 level with a referral pattern of pain off to the left side." (Tr. 461) He further opined that if this discogram showed concordant symptoms as he had believed, then a single level fusion would be a possibility. (Tr. 461)

On June 29, 2004, Dr. Mahawar performed a second physical evaluation of Krahn for the DDB and completed a Medical Source

16

Statement (Physical) regarding Krahn's ability to do work-related activities. (Tr. 462-69) This exam was totally normal, except that Krahn had a mildly antalgic gait when walking independently and had mild difficulty getting on/off the exam table, tandem walking, and walking on his heels or toes. (Tr. 463-64) Krahn did not want to try squatting and hopping on one leg. (Tr. 464) Based on the exam, Dr. Mahawar concluded that Krahn had "neck, back and leg pain with [history of] disc herniation, balance problem with history of head injury, [and] obesity." (Tr. 464) In the medical source statement, Dr. Mahawar opined that Krahn could lift/carry up to 20 pounds occasionally and less than 10 pounds frequently, stand for less than two hours, and sit without limitation. (Tr. 466-67) He further stated that Krahn was mildly to moderately limited in his ability to push or pull with his lower extremities, and only could climb, balance, or kneel occasionally, but never crouch, crawl, or stoop. (Tr. 467) He also said that Krahn should not work around vibration, humidity/wetness, or hazards. (Tr. 469)

At the second ALJ hearing on May 20, 2004, Krahn testified that the car accident in 2002 caused him increased pain in his right hip and tailbone, making it hard for him to sit for long periods or lay down on his back. (Tr. 530-31) He stated that his medications took a "little bit" of the pain away and denied any side effects from the drugs. (Tr. 532) On cross-examination, however, he testified that Zanaflex, which he took twice a day, made him extremely drowsy. (Tr. 550) Krahn described his day as

17

getting approximately four hours of sleep during the night, taking his medications, watching television, taking an afternoon nap, eating dinner, and then going to sleep. (Tr. 532-33) He did not do housework, but he went to church and to the grocery store weekly. (Tr. 535) He stated that he drove rarely, that the furthest he had driven in the last two months was five miles, but that he had ridden in a car for one and one-half hours when his brother drove to Lafayette, Indiana in 2003. (Tr. 434) The furthest he had walked was one block. (Tr. 535)

Krahn further testified that he could hold a coffee cup and extend his arms without problem but that he had "a lot of shaking."  He said that the shaking would increase with exertion, such as walking or picking something up. (Tr. 544) He also believed he could stand for about five minutes before needing to sit, and sit for about 45 minutes to an hour before he would need to lay down. (Tr. 538-39) The most he felt he could lift was 5 pounds. (Tr. 540) He said that once a month he would have bad back spasms that would require him to lay in bed, and that many other days during the month he would lay on his side during the day because his back would feel like it was going to go out. (Tr. 541-42) He testified that he used the cane for balance and pain. (Tr. 549)

After Krahn testified, ALJ Wilkin posed a series of hypothetical questions to VE Clifford Brady. (Tr. 551-56) In response to the first hypothetical, for a claimant with Krahn's age, education, and work history who was limited to sedentary work

18

with no repetitive bending, stooping, crawling, or climbing and
that would allow position change at will, VE Brady testified that
Krahn could perform 1300 order clerk, 2200 information clerk,
1100 hand packaging, and 1100 security monitor jobs. (Tr. 554)
For a second hypothetical with the same limitations plus the
restriction that the job require low degrees of concentration and
involve only one or two steps, VE Brady stated that Krahn could
perform 1300 mechanical assembly, 1200 electrical assembly, and
1100 hand packaging jobs. (Tr. 555) For a third hypothetical with
the limitation that Krahn could not sustain eight hours of work,
VE Brady testified that Krahn could not perform any jobs. (Tr.
555) On cross-examination, VE Brady stated that if drowsiness
from medications and/or pain made Krahn unable to concentrate on
a simple one or two-step job, then Krahn would be relegated to a
workshop setting rather than competitive employment. (Tr. 556) In
addition, if Krahn missed more than one and one-half days of work
each month, he would not be able to sustain employment. (Tr. 556)

In his decision denying benefits on August 12, 2004, ALJ
Wilkin noted that Krahn "initially reported disability . . . due
to residuals from a head injury, back pain due to herniated
discs, poor balance, dizziness, headaches, and pain and numbness
in the hands, arms and legs" but then characterized Krahn's
hearing testimony as focused primarily on back pain following his
2002 accident. (Tr. 26) He also noted that Krahn did not seek
medical care until two days following his first accident in
February 2000, that he did not begin physical therapy until April

19

2000, and that he stopped therapy after "a couple of sessions," complaining of dizziness and tremors. (Tr. 27) ALJ Wilkin next considered the opinions of Dr. Levin, Dr. Christea, and Dr. Luciani, as well as the results from Krahn's brain and back MRIs and EMG study. (Tr. 27) He acknowledged Dr. Christea's referral to the Balance Centers of America, but he did not mention the results of Krahn's examination there or subsequent diagnoses other than the Balance Center's recommendation that Krahn undergo outpatient physical therapy and home exercise. (Tr. 27) He also traced the references to Krahn's Worker's Compensation suit, as well as the times which Krahn declined medical care due to insufficient funds, throughout the record.  ALJ Wilkin further considered Krahn's medical records subsequent to his 2002 car accident including Krahn's x-rays, MRI's, CT Scan, and two therapy sessions that failed to improve Krahn's condition. (Tr. 28) ALJ Wilkin also noted the failed epidural and medial branch blocks performed by Dr. Adlaka, Dr. Khanna's recommendation of a discogram, and the results of Dr. Kubinski's psychological eval-uation in February 2003. (Tr. 29) Finally, ALJ Wilkin recounted Krahn's hearing testimony and Dr. Mahawar's impressions of Krahn's RFC. (Tr. 29-30)

Based on this evidence, ALJ Wilkin found that Krahn had the severe impairments of degenerative disc disease of the cervical and lumbar spines, obesity, and hypertension. He declined to find Krahn's depression or affective disorder as severe.  In determin-ing Krahn's credibility at Step Four, ALJ Wilkin found that

20

Krahn's subjective complaints were disproportionate to the
objective medical evidence and appeared "motivated in part by a
desire for financial compensation." (Tr. 30) In support of this
conclusion, ALJ Wilkin cited the speed at which Krahn filed for
worker's compensation following his first accident (he filed
within the month he was injured) and referenced Dr. Kubinski's
opinion that Krahn was "quite bitter" when the claim was denied,
even though the accident was "so inconsequential that no one
working with the claimant realized that anything unusual had
happened." (Tr. 31) ALJ Wilkin also opined that Krahn's changed
story regarding how he was injured, and his failure to report his
dizziness and cervical pain to Dr. Luciani until after his
worker's compensation claim was denied, was simply an attempt to
separate his injury in 2000 from his preexisting back problems.
(Tr. 31)

Based on the objective medical evidence regarding Krahn's
back problems, ALJ Wilkin concluded that Krahn could perform a
wide range of light work as suggested by Dr. Fife in 2001, for
the period immediately following Krahn's 2002 accident. (Tr. 31)
He summarized that Krahn's condition had not changed beyond a few
bulging discs, that Krahn never had been prescribed a cane
despite his use of one, and that there was no evidence that his
back had "gone out." (Tr. 32) He also discounted Krahn's descrip-
tions of "debilitating" pain because Krahn had received only
"intermittent care," had declined to proceed with surgery, never
seriously pursued treatment for his balance problem, and drove

21

"distances up to five miles at a time." (Tr. 32) Thus, ALJ Wilkin
determined that Krahn had the RFC to perform sedentary one-or-two
step work with the limitations that he could lift up to 10 pounds
at a time, occasionally carry small items like docket files,
occasionally stand and walk, avoid repetitive bending, stooping,
crawling or climbing due to back and neck pain, and be allowed to
change positions at will. (Tr. 32) He then explained why this RFC
differed from that proposed by Dr. Mahawar. (Tr. 32-33) Finally,
at Step Five, ALJ Wilkin concluded that Krahn could perform the
jobs stated by VE Brady in response to the ALJ's second hypothet-
ical.

Discussion

The standard for judicial review of an ALJ's finding that a
claimant is not disabled within the meaning of the Social Secu-
rity Act is limited to a determination of whether those findings
are supported by substantial evidence.  42 U.S.C. §405(g) ("The
findings of the Commissioner of Social Security, as to any fact,
if supported by substantial evidence, shall be conclusive.");
**Schmidt v. Barnhart**, 395 F.3d 737, 744 (7th Cir. 2005); **Lopez ex
rel Lopez v. Barnhart**, 336 F.3d 535, 539 (7th Cir. 2003).  Sub-
stantial evidence has been defined as "such relevant evidence as
a reasonable mind might accept to support such a conclusion."
**Richardson v. Perales**, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28
L.Ed.2d 852, (1972)(*quoting* **Consolidated Edison Company v. NRLB**,
305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)).
*See also* **Jens v. Barnhart**, 347 F.3d 209, 212 (7th Cir. 2003);

22

*Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act   The claimant must show that he is unable

> to engage in any substantial gainful activity
> by reason of any medically determinable phys-
> ical or mental impairment which can be ex-
> pected to result in death or which has lasted
> or can be expected to last for a continuous
> period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A)

The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  20 C.F.R. §404.1520.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b).  If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. §404.1520(c).  Third, the ALJ determines whether that severe

impairment meets any of the impairments listed in the regula-
tions.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does,
then the impairment is acknowledged by the Commissioner to be
conclusively disabling.  However, if the impairment does not so
limit the claimant's remaining capabilities, the ALJ reviews the
claimant's "residual functional capacity" (RFC) and the physical
and mental demands of his past work.  If, at this fourth step,
the claimant can perform his past relevant work, he will be found
not disabled.  20 C.F.R. §404.1520(e).  However, if the claimant
shows that his impairment is so severe that he is unable to
engage in his past relevant work, then the burden of proof shifts
to the Commissioner to establish that the claimant, in light of
his age, education, job experience and functional capacity to
work, is capable of performing other work and that such work
exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R.
§404.1520(f).

Krahn's first argument in support of remand is that the ALJ
made an improper credibility determination at Step 4.  The ALJ
discounted Krahn's credibility based on four factors: (1) what
the ALJ classified as the "intermittent" care Krahn received; (2)
the ALJ's perception that Krahn was motivated by financial
desire; (3) Krahn's ability to drive; and (4) the disproportion-
ate level of pain Krahn alleges compared to the objective medical
evidence.  Because the court agrees that the ALJ erred in consid-
ering each of these factors, remand is necessary.

24

With respect to Krahn's level of care and alleged motivation for financial gain, SSR 96-7p directs that when a claimant has not pursued prescribed medical treatment,

> the adjudicator must not draw any inferences
> about an individual's symptoms and their
> functional effects from a failure to seek or
> pursue regular medical treatment without
> first considering any explanations that the
> individual may provide, or other information
> in the case record, that may explain infre-
> quent or irregular medical visits or failure
> to seek medical treatment.

SSR 96-7p, at *7

Prior to discounting a claimant's credibility on the issue of noncompliance, SSR 96-7p requires the ALJ to determine whether the claimant had a good reason for his failure by soliciting an explanation from the claimant. SSR 96-7p, at *7; *See* ***Conner v. Barnhart***, No. 1:04CV0469-JDT-TAB, 2005 WL 1939951, at *4 (S.D. Ind. 2005); ***Lovellette v. Barnhart***, No. 1:02-CV-273, 2003 WL 21918642, at *10 (N.D. Ind. 2003).  Under SSR 96-7p, a claimant's inability to afford treatment or access free or low-cost medical services may provide insight into the claimant's credibility. *See* SSR 96-7p at *8.

In addition to the ALJ's failure to inquire into why Krahn pursued "intermittent" care as required by SSR 96-7p, there are a number of factual errors and misrepresentations in the ALJ's opinion.  First, it is unreasonable to draw an adverse inference from the mere fact that Krahn filed a claim for worker's compen-sation within a month of his injury in 2000 or that he was "bitter" at its denial, particularly when this conclusion comes

from a psychological evaluation in which Dr. Kubinski attributes the bitterness to psychosocial stressors and a passive personality. (Tr. 443) Likewise, the ALJ misrepresents the record when he states as fact that the accident in 2000 was "so inconsequential that no one working with the claimant realized that anything unusual had happened." (Tr. 31) Once again, this statement is taken from Dr. Kubinski's opinion of what "appeared" to be the case three years after the fact and has no factual support in the record. Regardless, while it is true that Krahn did not initially report a head injury to Dr. Luciani, Dr. Luciani's records show that within one week of the 2000 accident, Krahn was describing shooting pain in his arms. (Tr. 312) In addition, it is undisputed that Krahn had an objectively measureable VOR stabilization deficit after the incident. (Tr. 370) Under these circumstances, the ALJ cannot conclude that Krahn fabricated the head/neck injury portion of his claim to distinguish a pre-existing condition. (Tr. 31) The precise manner in which Krahn's dizziness or visual problems began is largely irrelevant, given the undisputed medical evidence that these problems exist.

Moreover, the ALJ is mistaken that the record contains no evidence of Krahn's back "going out" or Krahn going to the doctor or hospital for such a condition. (Tr. 32) Just as Krahn testified in the hearing, Krahn went to the emergency room in November 2001 when his back "popped." (Tr. 352) The ALJ's statement that Krahn has not pursued medication therapy also fails in light of the myriad medications Krahn has taken for multiple months,

including Meclezine, Neurontin, Flexeril, Zanaflex, Vicodin, Celebrex, and Tylenol with Codeine. (Tr. 416, 419, 457, 452) Furthermore, the court can find no statement, as the ALJ alleges, that Krahn "wouldn't proceed with surgery even if dictated by the evidence." (Tr. 32) The only evidence regarding back surgery on record is Dr. Khanna's desire to seek a discogram to determine *if* surgery would be beneficial, and Krahn's hearing testimony that there's a "lot of risk" with surgery. (Tr. 461, 534)

Finally, it is undisputed that Krahn has no paycheck, no food stamps, no worker's compensation benefits, and no insurance. However, outside of the care he explicitly stated he could not pursue due to financial restrictions, Krahn diligently has pursued and completed every treatment suggested by his physicians with the exception of two therapy appointments in April 2000. (Tr. 398) Moreover, every physician who has commented on Krahn's extreme sense of pain either has drawn no adverse inference or has described Krahn's perception as a pain syndrome, attributable to an underlying pathology, or a psychosomatic problem. (Tr. 216, 285-86, 419, 421, 441) In sum, there is absolutely no evidence on record that Krahn is malingering, pursuing disability benefits purely for financial gain, or not participating in his care to the extent his financial condition permits.  The only evidence arguably pointing to a lack of compliance with medical care not attributed to financial duress is Krahn's apparent failure to perform home exercises.  (Tr. 32) In any event, the ALJ should have inquired into Krahn's reasons for not performing these

exercises before drawing an adverse inference. *See* SSR 96-7p, at
*7-8.

Turning to the ALJ's statement that Krahn "still drives up
to 5 miles at a time," the court notes that Krahn actually
testified that he drove rarely, did not like to drive because he
had problems focusing his eyes, and that the most he had driven
in the past two months was five miles. (Tr. 157-58, 434) The ALJ
must distinguish "between a person's being able to engage in
sporadic physical activities and [his] being able to work eight
hours a day five consecutive days of the week." ***Carradine v.
Barnhart***, 360 F.3d 751, 755 (7th Cir. 2004). *See also **Zurawski
v. Halter***, 245 F.3d 881, 887 (7th Cir. 2001); ***Clifford v. Apfel***,
227 F.3d 863, 872 (7th Cir. 2000). The Seventh Circuit consis-
tently has held that "the ALJ may not rely on minimal daily
activities as substantial evidence that [the] claimant does not
suffer disabling pain." See ***Clifford***, 227 F.3d at 872 (*citing
**Thompson v. Sullivan***, 987 F.2d 1482, 1490 (10th Cir. 1993)). *See
also **Carradine***, 360 F.3d at 755; ***Zurawski***, 245 F.3d at 887. The
ALJ's reliance on Krahn's testimony to support his conclusion
that he is not lightheaded or dizzy makes too much of an activity
Krahn performs sporadically, particularly when his testimony is
that he does not like to drive precisely because turning his head
makes him dizzy. (Tr. 157-58)

With respect to the difference between Krahn's subjective
complaints of pain and the objective medical evidence, the ALJ
must determine Krahn's credibility only after considering all of

28

his symptoms "and the extent to which [his] symptoms can reason-
ably be accepted as consistent with the objective medical evi-
dence and other evidence." 20 C.F.R. §404.1529(a).  If Krahn's
impairments reasonably could produce the symptoms of which he is
complaining, the ALJ next must evaluate the intensity and persis-
tence of the symptoms through consideration of his "medical
history, the medical signs and laboratory findings, and state-
ments from [his] treating or examining physician or psychologist,
or other persons about how [his] symptoms affect [him]." 20
C.F.R. §404.1529(c)(1).  If the symptoms Krahn describes are not
supported by the objective medical evidence, "the ALJ must obtain
detailed descriptions of [Krahn's] daily activities by directing
specific inquiries" about the symptoms and their effect on him.
**Clifford**, 227 F.3d at 871 (*quoting* **Luna v. Shalala**, 22 F.3d 687,
691 (7th Cir. 1994)). While Krahn's complaints of disability
cannot be based on symptoms totally unfounded in medical find-
ings, the ALJ may not make a credibility determination "solely on
the basis of objective medical evidence." SSR 96-7p, at *1. *See
also* **Carradine**, 360 F.3d at 754; **Indoranto v. Barnhart**, 374 F.3d
470, 474 (7th Cir. 2004).  However, the ALJ "need not totally
accept or totally reject [Krahn's] statements." SSR 96-7p, at *4.
Rather, the ALJ can make a determination, based on the totality
of the evidence, that Krahn's statements are only credible to a
certain degree. SSR 96-7p, at *4.

While the errors outlined above already necessitate remand
for a proper credibility determination, the court further notes

that this case is strikingly similar to *Carradine*, 360 F.3d at
755. In *Carradine*, the plaintiff applied for disability benefits
after suffering a slip and fall on ice. Objective medical records
did not support the extreme pain Carradine alleged, and she had
been diagnosed with numerous ailments including "degenerative
disc disease, scoliosis, depression, fibromayalgia, and
'somatization disorder,' the last term . . . being a fancy name
for psychosomatic illness." *Carradine*, 360 F.3d at 754.  In addi-
tion, she had pursued many pain-treatment procedures including
not only "heavy doses of strong drugs such as Vicodin, Toradol,
Demerol, and even morphine, but also the surgical implantation in
her spine of a catheter and a spinal cord stimulator." *Carradine*,
360 F.3d at 755.  The Seventh Circuit concluded that the ALJ
mistakenly discounted Carradine's complaints based solely on the
objective medical records when Carradine's pursuit of these
procedures, as well as the "improbability that she is a good
enough actress to fool a host of doctors and emergency-room
personnel into thinking she suffers extreme pain; and the (per-
haps lesser) improbability that this host of medical workers
would prescribe drugs and other treatment for her if they thought
she were faking her symptoms," all supported the inference that
Carradine's pain was genuine.  *Carradine*, 360 F.3d at 755.  In so
concluding, the Seventh Circuit noted, "If pain is disabling, the
fact that its source is purely psychological does not disentitle
the applicant to benefits." *Carradine*, 360 F.3d at 754.

Here, Krahn has tried multiple medications, pursued weeks of physical therapy on at least four occasions, sought evaluation by neurologists, orthopedists, and pain specialists, gone to the emergency room with complaints of back pain, undergone MRIs, X-rays, CT scans, bone scans, EMG studies, an epidural, a medial branch block, and most recently, considered a discogram and single level fusion of his lumbar spine.  Dr. Martino, Dr. Kubinski, and therapist Marika Murray all have suggested that Krahn has a psychosomatic element to his condition. (Tr. 285, 421, 441) In addition, many physicians have noted muscle spasms, Dr. Christea observed that Krahn's tremors were "consistent with an exaggerated physiologic tremor due to pain and a sense of 'weakness,'" an EMG taken in 2000 showed a decrease in recruit-ment pattern related to either pain or fatigue, and Krahn dis-played "chronic pain behavior," including "profound sweating, turning pale" during therapy in April 2003. (Tr. 239, 244, 436) While presumably possible, it is difficult to imagine that a claimant can manufacture muscle spasms or a tremor, make himself profusely sweat, or turn pale on cue during therapy. When coupled with the factual errors and unreasonable assumptions made by the ALJ regarding Krahn's financial situation, this additional evidence regarding pain necessitates remand for a "fuller and more exact engagement with the facts." *Carradine*, 360 F.3d at 756.

While the court need not reach Krahn's other arguments in support of remand, the ALJ is directed to consider Krahn's

diagnosis of VOR stabilization deficit and the objective evidence in support thereof when determining Krahn's RFC. (Tr. 369-70) It was improper for the ALJ to ignore this evidence and to discount Krahn's claims of disability based on dizziness, poor balance, and headaches when the ALJ did not even inquire into Krahn's dizziness during the hearing.  *See **Smith v. Apfel***, 231 F.3d 433, 438 (7th Cir. 2000)(noting the ALJ's duty to develop the record); ***Herron v. Shalala***, 19 F.3d 329, 333 (7th Cir. 1994) (stating that the ALJ may not ignore an entire line of evidence). Krahn's counsel cross-examined Krahn on the impact of his dizziness, and there is objective evidence supporting Krahn's allegations. Similarly, the ALJ should consider the impact of Krahn's tremors on his ability to work.

_____

For the foregoing reasons, the Motion for Summary Judgment filed by the plaintiff, Frederick Krahn, on July 21, 2005 is **GRANTED**.

ENTERED this 2nd day of March, 2006

s/ ANDREW P. RODOVICH
United States Magistrate Judge

32